**UNITED STATES of America**

**v.**

Anthony **SALERNO**, a/k/a "Fat Tony," Vincent **Cafaro**, a/k/a "Fish," Vincent **DiNapoli**, a/k/a "Vinnie," Louis **DiNapoli**, a/k/a "Louie," Giuseppe **Sabato**, a/k/a "Pepe," Carmine **Della Cava**, a/k/a "Carmine," Thomas **Cafaro**, a/k/a "Tommy," John **Tronolone**, a/k/a "Peanuts," Milton **Rockman**, a/k/a "Maishe," Nicholas **Auletta**, a/k/a "Nick," Edward J. **Halloran**, a/k/a "Biff," Alvin O. **Chattin**, a/k/a "Al," Richard **Costa**, a/k/a "Richie," Alphonse **Mosca**, a/k/a "Funzi," and Neil **Migliore**, a/k/a "Neil," Defendants.

**No. 86 Crim. 245 (MJL).**

United States District Court, S.D. New York.

April 2, 1986.

Allan Cohen and Mark Hellerer, U.S. Atty's. Office for S.D.N.Y., New York City, for U.S.

Anthony M. Cardinale, Boston, Mass., for defendant Salerno.

Michael Rosen, New York City, for defendant Cafaro.

WALKER, District Judge:

The government has moved pursuant to the Bail Reform Act of 1984, 18 U.S.C. section 3142(f)(1)(A), "in a case ... that involves ... a crime of violence" for pretrial detention of defendants Anthony Salerno and Vincent Cafaro, who, with thirteen other defendants, are named in indictment 86 Cr. 245 (MJL) filed on March 20, 1986, and unsealed on March 21, 1986. The government concedes that neither defendant poses a risk of flight but urges strenuously that no condition of bail or combination of conditions will assure the safety of the community or of any person and that therefore pretrial detention is mandated under 18 U.S.C. section 3142(e). For the reasons set forth below, this court finds that the government has established by clear and convincing evidence that both defendants pose a present danger to the community and that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

On March 21, 1986, both defendants appeared for the first time before this court, sitting in Part I. Both defendants moved for a 5-day continuance as provided in 18 U.S.C. section 3142(f), and this court set the hearing for March 26, 1986. The hearing was held on March 26 and 27, 1986.[1] The information received from both sides was by way of proffer as permitted by *United States v. Martir*, 782 F.2d 1141 (2d Cir. Feb. 3, 1986).

The 88-page indictment charges that the fifteen defendants were leaders, members, and associates of the "Genovese Organized Crime Family of La Cosa Nostra (The Genovese Family)," that the Genovese Family was an "enterprise" as defined in 18 U.S.C. section 1961(4), and that the purposes of the enterprise included the unlawful infiltration in New York City of legitimate businesses in the concrete construction, food manufacturing, and food distribution industries, exercise of control over unions in these and other industries, operation of illegal gambling businesses, loansharking, murder and conspiracies to murder those who would threaten the enterprise, engendering fear of the enterprise through violence and concealment of the existence of the enterprise from law enforcement authority.

The indictment charges that the means and methods of the enterprise included the maintenance of a hierarchical "organized criminal group" operating in New York and other states. The enterprise operated through "crews" made up of "members" and "associates" and led by a Captain, or "Capo." In charge of the several "crews" and their "capos" was an overall "Boss" and, at times, an "Underboss." When a "Boss" was incapacitated or imprisoned, one of the "Capos" in the Genovese Family served as "Acting Boss." The "Bosses" and "Capos" supervised and protected the criminal activities of the enterprise's members and associates. The indictment charges that Anthony Salerno is the present "Boss" of the Genovese Family and has served in the past as its "Acting Boss" and "Consigliere" and that Vincent Cafaro is a "Capo" in the Genovese Family.

The indictment delineates the roles of all defendants in the Genovese Family hierarchy and in its criminal racketeering activities of bid-rigging in the concrete construction industry, extortion, loansharking, labor racketeering, gambling, and the use of violence. The defendants are charged both with conspiracy to participate in the above racketeering enterprise and actual participation in the enterprise in violation of 18 U.S.C. section 1962. The indictment further charges sixteen counts of mail fraud, under 18 U.S.C. sections 1341 and 1342, in connection with the bid-rigging scheme in the concrete construction industry whereby the enterprise rigged subcontract bids valued variously in the range of $3,000,000 to $13,000,000 in major building projects in New York City. The indictment further alleges an 18 U.S.C. section 1343 wire

---

**1.** On March 27, 1986, the case was assigned by lot to Judge Lowe pursuant to Rule 8 of the Local Rules for the Division of Business Among District Judges. With Judge Lowe's consent, this court completed the hearing and is entering the within findings and conclusions.

fraud count relating to the election and control of Roy L. Williams as President of the Teamsters International; a conspiracy to extort payments from a food distributor, Marathon enterprises, seven extortion counts relating to Marathon's distribution arrangements with legitimate retailers, and a conspiracy to extort payments from one Anthony Giordano, all in violation of 18 U.S.C. sections 1951 and 1952; one count of illegal numbers in violation of 18 U.S.C. section 1955 and one count of illegal bookmaking, both in violation of 18 U.S.C. section 1955.

A principal thrust of the indictment is that the power and effectiveness of the Genovese Family to carry out its criminal activities depends on its ability and willingness to use violence and its reputation for violence. Violence is alleged as a method and means of the racketeering enterprise and the specific racketeering acts alleged include not only the foregoing extortion counts, but two murder conspiracies as well.

## FACTS

The government's proffer in support of detention consisted of the prospective testimony of two witnesses who had previously testified in organized crime trials, James Fratianno and Angelo Lonardo, evidence from a search conducted at the apartment at 115th Street and First Avenue, the full-time residence of Cafaro and the in-town residence of Salerno, as well as excerpts from electronic surveillance in two locations in Manhattan from which Genovese Family business was conducted—the Palma Boys Social Club and the Social Club at 2244 First Avenue—and one location in a trailer in Edgewater, New Jersey.[2] The proffers related primarily to conspiracies to murder, and labor, loansharking, and gambling violence.

*Conspiracy to Murder*

The government proffered that Fratianno would testify, as he had in a previous trial, that in 1976 he attended a meeting in a back room of a store in which members of Genovese Family including Salerno were present. Those assembled decided to murder John Spencer Ullo, a person engaged in loansharking for the Genovese Family. There was a vote taken and, Fratianno testified that "Gigante said 'I vote to hit,' Tieri said 'Hit,' Salerno said 'Hit,' and it went around the table in a unanimous fashion." The "contract" was not carried out when Ullo got wind of the plan in California and was himself able to kill the hitman. The government proffered that it would corroborate Ullo's role in the Genovese Family, that Ullo feared certain individuals in the family and took steps to protect himself once he learned that the individual in California was out to kill him. T. 13–15. The trial at which Fratianno testified resulted in the conviction of Tieri.

The government proffered that according to another prospective witness, Angelo Lonardo, Salerno and the Genovese Family issued a "contract" in 1980 to kill John Simone who was also known as Johnny Keyes. The "contract" arose out of the murder of Angelo Bruno, the former head of the LCN family in Philadelphia. Salerno contacted one John Tronolone and asked him to pass out the word that there was a "contract" on the life of Johnny Keyes and others. While in Florida, Tronolone told Lonardo that if Keyes shows up then the "contract" should be fulfilled. Lonardo at the time was the head of the Cleveland LCN family that reported to the Genovese Family in New York and Tronolone was its

---

**2.** The government relied upon the Edgewater surveillance in its proffer against Salerno in connection with a conspiracy to murder and extort Andrew Giordano in 1984. Salerno argued that 18 U.S.C. section 2518(9) was violated since he was not given ten-days notice of its use at the hearing. Whether that ten-day notice requirement applies at a pretrial detention hearing is open to question given the five day limitation on 18 U.S.C. section 3142(f) continuances.

The court has received this proffer on the government's representation that Salerno lacks standing to move to suppress the Edgewater surveillance and thus is not prejudiced by the government's non-compliance with the ten day requirement. The validity of the two Manhattan surveillances has been fully litigated in other proceedings and is not objected to by either Salerno or Cafaro.

"consigliere" who, in effect reported to two bosses, Salerno and Lonardo. Johnny "Keyes" Simone asked Tronolone for his assistance in settling the matter. However, Tronolone lied to Keyes in saying that he would try to settle his dispute with Salerno. Tronolone told Lonardo that instead he would go to New York to see Salerno to set Keyes up. After speaking to Salerno, Tronolone told Lonardo that he would now tell Keyes to travel to New York and that everything was okay. Keyes went to New York to see Salerno and was killed with three bullets in the head. Later Tronolone explained to Lonardo that he had set Keyes up. T. 16–18.

Lonardo will also testify that two individuals, John Nardi and Danny Green in the Cleveland LCN were killed in 1977. Prior to the murders, Lonardo and Jack Licavoli of the Cleveland Family came to New York to explain the problem to Salerno and Philip Lombardo, alias Benny Squint, who was at that time the "Boss" of the Genovese Family. Licavoli and Lonardo asked Salerno and Lombardo to request Castellano to carry out the "contract" on Green and Nardi if they appeared in New York to meet with him. Both Salerno and Lombardo approved the "contract" and agreed to do so. Before the "contract" could be fulfilled in New York, Nardi and Green were killed elsewhere in car bombing incidents. T. 18–24.

In another murder conspiracy, one Milton Parness requested permission of Salerno to kill Anthony Giordano, a debtor to Parness' extortion operations. Parness is overheard on surveillance in January 1985 telling an associate that Salerno responded to Parness' inquiry "Do we kill him and get it over with?" by replying "If you want to kill him, we will kill him." T. 24–29.

In addition to witness testimony indicating that Salerno is presently the Genovese Family "Boss," the government proffered an intercept of Salerno in 1984 on an occasion when Salerno describes how he would deal with someone who owes money to him. Salerno says that if the person asks him who he is, he will say: "Who am I? I'm the f____g boss." T. 30.

In an intercept in February, 1984, Vincent Cafaro, his son Thomas Cafaro, and a third individual are overheard discussing an Uzi machine gun in their possession at 2244 First Avenue. Cafaro says he knows about these sorts of weapons because "I got the same thing upstairs." T. 31–32. In February, 1985, a search executed in the 115th Street apartment shared by Salerno and Cafaro yielded a .25 caliber automatic weapon together with an empty clip and seven live rounds of ammunition. Cafaro admitted at the time that the weapon was his. T. 33.

*Labor Violence*

In early 1984, a conversation between Salerno, Christopher Fennari and Vincent Cafaro was intercepted relating to who was to take control of a local carpenters' union. Salerno explains to Cafaro a prior incident with the carpenters: "[W]e sent a couple of kids after the carpenters. This is a good two years ago. They gave them a beating." T. 34.

In another conversation in early 1984, Cafaro is told by another person that his son was involved in a bar fight and later told a woman and a man in the bar, if asked about the fight, to "mind their own business." Afterwards, the person received a phone call from somebody claiming to know "Fish," Cafaro's alias, and wanting to know why his son spoke to his daughter that way. Upset at this unauthorized use of his name, Cafaro tells the man to tell the phone caller: "Just say: 'Fish' said if you ever mention this name again or this guy's name again, he is going to come over here personally and break your f____g legs." T. 34–36.

*Loansharking and Extortion Violence*

In January 1984, Cafaro's son Thomas explains to his father that an associate, "Crazy Tom", was asking another person for $2,500 owed to him. When Thomas Cafaro states that Crazy Tom started yelling at the kid, Vincent Cafaro interjected "Why didn't he give him a f____g beating?" Later in the conversation, Cafaro, referring to the debt, says that to collect the money he should tell him "I will break your f____g

ass. Give me my money. If you ain't got my money in a week, I am going to break your f____g ass, that's all." He later tells his son that he better tell Crazy Tom that this fellow better not come by the club because he would then have to get Crazy Tom to "break the f____g kid's head." T. 37–39.

In another conversation in early 1984, Vincent Cafaro speaks to an associate about a debt owed to him by one, Ralph. Cafaro states "I was going to give him a f____g beating like when Richie was here. If I had him, I'm going to break his mother f____g legs." Later on in a conversation, Cafaro relates "I had an incident with him; going down there, threaten the f____g, knock his f____g brains in. We got to prove it, I threatened to get the money." His associate replies "You had to get $500 a week. It was his job, he gives you the first couple of payments. After that, what happens? He cries." T. 40.

In a conversation in early 1984 between Cafaro and one "Pete," Cafaro states that he told Frankie Salerno to "get a hold of this kid [that owes him money] and bring him to me. He wants to be a wise guy. He told the guy he wants to bet from a thousand to $2500 and he thinks he ain't going to pay? I'll knock his f____g brains in." Later on, Pete tells Cafaro: "I put up with him Fish. I came and I gave him a beating." Cafaro replies: "Good he deserves it." Pete says: "I gave him a beating. He was all full of blood. His f____g face was all marked. Every f____g shot I gave him, he had a lump like this, cuts here, cuts there; ah, I, he ain't got no face." Cafaro replies: "Yeah, you banged him up good, f__k him." T. 41.

In a conversation in March 1984, Salerno tells two others about an individual to whom Salerno had lent $150,000. When Salerno learns that the money is not being used for its intended purpose, he tells his listeners what he told the borrower "I told him, I says, what did I give you that money for? I said, I didn't give you the $150,000 to straighten everybody out, you c_____r. If you don't bring me that money Saturday ... I know he could give me the money now if he has got it, he has to get it out of all these big shots. ... I says I will kill you right in f____g, you c_____r. And I walked out." T. 42.

*Gambling Violence*

The government proffered numerous conversations relating to the problems that Cafaro and Salerno had with regard to outside competitors of the Genovese family numbers business and, in particular, violation of the "two-block rule" whereby a competitor was not permitted within two blocks of a Genovese Family numbers store. In a conversation in early 1984, after Cafaro is told about a new store violating the two-block rule, he says: "Alright give me the address and I'll send these kids. I'll send these kids right up there. They will take the joint and put it all in the street. They don't want the f__ks. Knock the f____g joints right out. These kids here, these Cuban kids I got around me, they are good kids. I used them against the Jews the way I used Blood [an enforcer for the Genovese gambling operation] against the niggers. You understand when there is a beef with a nigger, don't worry, Frankie, I'll handle it." T. 43, 44.

In a conversation in January 1984, Cafaro tells one "Artie," who appears to have a role in the Genovese gambling operations, of a dispute with the owner of a new competing gambling store in violation of the two-block rule, Cafaro said: "You are not opening that store." He said: "Well, I am open already. I am going to stay there." "Good, I says, fine." Cafaro goes on: "Now, I says, tomorrow I'm giving you fair warning. I am coming there personally, and if that joint is open, f____g joint is going to go in the street and there's going to be a blood bath in there with your f____g body. I tried to be nice to you, I say, but I could see you want to go the other way. Fine, I got up and I said, 'come on, get out.' And he says: 'Wait a minute, can I talk?' 'There is nothing to talk about. You spoke, and you said what you had to say and that's it.'" T. 44–45

In another conversation in June 1984, Vincent Cafaro tells one "Freddie," also involved in Genovese gambling operation

about a numbers store Cafaro wants broken up. And he tells Freddie "Get hold of Blood, and tell Blood to send his guys into the store." "Break it up and put locks on the door, and whoever is in there, knock their f\_\_\_\_g brains out." Cafaro later says: "That's what those guys are paid for." T. 45

In another conversation in March 1984, Cafaro tells "Artie" about another store in violation of the two-block rule. He gives Artie directions to get there and tells him "I want you to go there and frighten people." T. 45

In a conversation in April 1984, Cafaro reports to Salerno about one "Bobby" controlled by "Buddy" who has opened up a numbers store across the street from one of theirs. Cafaro tells Salerno that they said that "They don't believe that the store across the street belongs to us, that I should go see Buddy." Cafaro says: "I'm going to tell Buddy: Buddy, this f\_\_\_\_g kid Bobby, if you can't control him, I will knock his f\_\_\_\_g brains in." T. 46–47.

In December 1984, Cafaro and Salerno discuss a problem with another numbers store, operated by Spanish Raymond Marquez, that is paying out too much money on the winning numbers. Cafaro and Salerno discuss the fact that they are "friendly" with Spanish Raymond, but still have to deal with the competitive threat. Cafaro tells an associate, who asks what should be done, "Do what you want." Salerno says: "You know, tell him not to mention our names because we are friendly with that guy." Cafaro asks: "With whom?" Salerno says: "With Raymond." Later, Salerno says: "Well, let them do what they want." Cafaro reports: "I told him, do what you want with the stores, but as far as him, leave him alone." Later, Cafaro reports to Salerno: "So, if you hear that he wants to see you about the stores, that they broke them up or whatever they did, I told them, Go ahead do what youse want, and I said, but leave him alone, I don't want him to get...." Later, Cafaro says: "We ain't going to f\_\_k around with him, we just going to break up any store he puts 9 to 1, we are going to break him up." Later, Salerno asks whether Blood is going to go along with them. Salerno later says: "This has been going on for 50 to 60 years, always trouble with them. They loose $2 and then they start scheming." T. 47–49.

Salerno proffered more than a dozen witnesses who would testify, in substance, that while they had no knowledge of any of the allegations in the indictment or of facts to support them, that they had known Salerno for many years, considered him a friend, and did not consider him to be any danger to the community.

Salerno also proffered that Fratianno and Lonardo were subject to impeachment on the basis of their criminal pasts and their favorable "deals" with the government.

Salerno also proffered a letter from his doctor since 1977, John H. Laragh, M.D. of the New York—Cornell Medical Center, setting forth the medical history of Salerno, age 74, to include "a long standing history of high blood pressure complicated by congestive heart failure." This condition, first discerned in 1961, has resulted in "serious vascular damage" which despite a "strict medical regimen" has progressed." Dr. Laragh's stated: "Since he has been under our care, we have simplified his medical regimen and accomplished much better blood pressure control." In 1981 Salerno suffered a stroke from which "he has recovered" with some limited residual disability. Dr. Laragh offered no opinion on the impact of a period of detention on Salerno's medical condition.

Salerno proffered no evidence tending to rebut the government's evidentiary proffer relating to Salerno's violent acts and conspiracies and his position as "Boss" of the Genovese Family.

Cafaro proffered no evidentiary material. He argued that the tapes revealed at most "tough talk" and that the government had offered no proof that the violent acts discussed by Cafaro were actually carried out.

## DISCUSSION

### (a) *United States v. Colombo*

The facts and holding in *United States v. Colombo,* 777 F.2d 96 (2d Cir.1985), are

particularly instructive to the court here.[3] In *Colombo*, the defendant, Anthony Colombo, headed a multifaceted criminal enterprise engaged in murder, robbery, narcotics, arson, extortion, threats, assaults, illegal gambling, bribery, theft, and mail and wire fraud.

On the basis of the government's proffer, the magistrate ordered Colombo's detention. Later, after a hearing, the magistrate ordered Colombo's release on the grounds that Colombo as the head of the organization did not personally participate in any violent act and that his ability to orchestrate violent actions was only moderately attenuated by his incarceration. Chief Judge Weinstein concurred with the magistrate's conclusion that the government had failed to establish by clear and convincing evidence that detention was necessary. Finding that the monetary conditions set by the magistrate assured only Colombo's presence at trial, Chief Judge Weinstein set other conditions of release designed to protect the community that are strikingly similar to those proffered by counsel for Salerno in this case. In holding the order of releasing Colombo on the specified bail conditions to be "clearly erroneous," the Court of Appeals stated:

> "The particular danger that Colombo, for purposes of the bail determination, was found to pose—that of alleged supervisor and director of the "Colombo crew"—is hardly alleviated by the type of conditions established by the district court. In light of Congress' direction that "[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate," S.Rep. No. 225 at 7; 1984 U.S. Code Cong. & Ad.News at 3189, we hold that the decision to release Colombo based upon conditions which we consider

to be wholly inadequate was clearly erroneous."

*Id.* at 100.

*Colombo* also held that consideration of the length of detention due to the probable delay in bringing the case to trial was inappropriate at the pretrial detention hearing since it remained a speculative matter and the Speedy Trial Act, 18 U.S.C. section 3161 *et seq.*, addressed any due process concerns on that score. *Id.* at 100–101.

(b) *Findings*

■ The court has received a great deal of information about Salerno's danger to the community; it is overwhelming. By "clear and convincing" proof, the government has established that Salerno is the head, or "Boss," of an organization engaged in extortion, loansharking, illegal gambling, and murder. The government has proffered information and has stated that witnesses will testify that Salerno conspired to murder John Spencer Ullo, Johnny "Keyes" Simone, Danny Green, and John Nardi. The government has proffered information showing that Salerno could order a murder merely by voicing his assent with the single word "hit." Although some of these murder conspiracies occurred between six and ten years ago, their seriousness and the ease with which they could be ordered weigh heavily in favor of finding that Salerno is a present danger to the community. In addition, Salerno voiced a willingness to "hit" Andrew Giordano in 1984.

Murder is not the only act of violence attributable to Salerno. He is a danger to the community as the "Boss" of an organization that uses force, violence, and threats of force and violence to further its illegal operations. The government proffered substantial information that Salerno's organization uses force and threats of

---

**3.** In *Colombo*, the charges relating to narcotics triggered the presumption that no condition or combination of conditions would assure the safety of the community. Such a presumption shifts to the defendant the limited burden of production and not the burden of persuasion. *Id.* at 98. Colombo met his burden of production.

In *Colombo*, as in the case before the court, the government had the burden to prove by clear and convincing evidence that no condition or combination of conditions of release would assure the safety of the community. The mere fact that a limited burden was rebutted in *Colombo* but is not present here is not sufficient grounds for distinguishing these cases.

force to maintain its illegal loansharking and gambling operations. These acts are carried out by or ordered by the organization's captain, Cafaro. However, as head of the organization, to whom Cafaro reports, Salerno controls the use of such force.

There is ample information to conclude that Cafaro and others under Salerno's control have the means to carry out the violent acts. The .25 caliber automatic weapon and ammunition found at the apartment shared by Salerno and Cafaro and the Uzi machine gun that Cafaro admitted having in his possession are proof enough that the organization has the ability to commit violent acts. Salerno also has the present ability to order such acts. There is ample proof that Salerno's organization engages other individuals to commit acts of violence.

Salerno offers several arguments in favor of his release. First, he argues that all the facts alleged in the indictment were known to the government in February 1985, when he was indicted in *U.S. v. Colombo*, 85 Cr. 139, the "Commission" case. He contends that the government should be precluded from moving for detention now because it failed to move for detention then.

But, simply put, not all the facts were known to the government at the time of the "Commission" indictment. Lonardo did not come forward as a government witness until August 1985, several months after the "Commission" indictment. Further, Salerno is not named in any specific murder conspiracy in the "Commission" indictment. Thus, it is far from clear that, at the time of the "Commission" indictment, the cumulative evidence against Salerno supported pretrial detention.

■ Salerno argues, alternatively, that if the new information were available in August, the government should have moved at that time for detention under section 3142(f) and its failure to do so should preclude this motion. While the government was permitted to seek detention of Salerno in August 1985, when the new information became available, the "first appearance"

requirement of 18 U.S.C. section 3142(f) would presently bar such an application in that case at this time. *U.S. v. Resek*, 602 F.Supp. 1126 (S.D.N.Y.1985). But no such impediment exists under this indictment where the government has moved for detention at the defendant's first appearance. With the "first appearance" requirement under section 3142 satisfied, the Act permits such detention if warranted.

As Salerno concedes, the government's failure to seek his detention earlier in the "Commission" case only effects the weight and credibility of the government's proffer that Salerno poses a danger to the community and does not bar the government from seeking detention under the new indictment as a matter of law. After according the government's proffer the weight it deserves, this court remains firmly convinced that Salerno poses a *present* danger to the community.

At the hearing, Salerno challenged the credibility of two named witnesses for the government, Fratianno and Lonardo. The court has carefully weighed the reliability of these witnesses and the other proffered information against the defendant in determining that he presents a danger to the community.

Although the proffered testimony of witnesses need not be corroborated, the government proffered that it would corroborate some of Fratianno's testimony about the John Spencer Ullo murder. Moreover, both Fratianno and Lonardo have given sworn testimony at other criminal trials which resulted in convictions. T. 15, 67. This court does not rely on the proffered testimony of either Fratianno or Lonardo alone, however, in making its finding. The cumulative nature of the proffered testimony of Salerno's role in murder conspiracies, the taped evidence of Salerno's willingness to kill Giordano, and the taped evidence of Salerno's role as "Boss" of the enterprise establish by clear and convincing evidence that Salerno is a danger to the community.

Salerno requested that Fratianno and Lonardo be produced for cross-examination to attack the credibility of each witness by exploring his criminal past and his agree-

ment with the government. Salerno made no proffer, however, that the factual account by either witness would contradict the government's proffer. Salerno did proffer that if cross-examined, both witnesses were impeachable based upon their prior bad acts and their "deals with the government." T. 101–103, 121–123.

■ The court declines to order the production of the witnesses and does rely in part upon the government's proffer as to the substance of their testimony if called. While the court may, in its discretion, order the production of witnesses, the defendant has no automatic right to their production.

At a pretrial detention hearing, many of the rights a defendant enjoys at a criminal trial are absent. The detention hearing is not punitive in nature; rather, it is an involuntary civil commitment proceeding at which proof by a standard less than "beyond a reasonable doubt" is applicable. See *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). In *U.S. v. Edwards,* 430 A.2d 1321 (D.C.App.1981) (en banc), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982), in upholding the constitutionality of a statute similar to the Bail Reform Act, that court stated:

> [P]retrial detention is not punitive in purpose. Our societal determination that the risk of error in a criminal trial be balanced in favor of the accused is closely tied to the punitive aspects of conviction and has no application to detention pending a trial at which the government will be required to meet the higher burden.

*Id.,* 430 A.2d 1339.

■ While the defendant at a pretrial hearing may cross-examine witnesses who do testify, such cross-examination may be limited to prevent premature discovery, protect witnesses' lives or protect ongoing investigations. *U.S. v. Acevedo-Ramos,* 755 F.2d 203, 205 (1st Cir.1985). Moreover, the government has no obligation to proceed by way of live testimony and a court may rely upon hearsay, including investigatory descriptions of evidence, where the judicial officer reasonably concludes that those descriptions, reports and similar evidence, in the particular circumstances of the hearing, are reliable. In enacting the Bail Reform Act of 1984, Congress did not wish to alter the nature of the informal proceeding at which bail had been set prior to its passage. *United States v. Acevado-Ramos, supra* at 206–08.

In a case, similar to this one, where the defendant requested the live production of government witnesses, the District of Columbia Court of Appeals, sitting En Banc, required the defendant to at least proffer that the testimony would tend to "negate substantial probability that the accused committed the charged offense" and held that "cross-examination for the purpose of impeaching witness credibility is an insufficient reason to compel a witness' presence." *United States v. Edwards, supra,* 430 A.2d at 1338.

The government has a substantial interest at this early stage of the case in preventing premature discovery, in protecting the emotional and physical well-being of its witnesses and in preventing impairment of on-going investigations. On the record of this case, the court finds that these interests outweigh any prejudice claimed by Salerno in not being able to directly impeach Fratianno and Lonardo. This prejudice is minimized by Salerno's proffer of impeachment material as to these witnesses, which the court takes into account in reaching its findings, as well as the substantial independent proof against Salerno.

■ Salerno's proffer of witnesses to testify to his lack of dangerousness to the community is of marginal utility to the court. Such witnesses admittedly know nothing of the allegations in the indictment nor of the facts in support of them. Yet it is precisely those charges and the specific facts supporting those charges, proffered by the government in great detail, that support the government's contention that detention is required. Given the clandestine nature of such organized criminal activity, the fact that many people are unaware of Salerno's behavior and role in the enterprise and thus can be expected to testify as to his lack of dangerousness is neither surprising nor useful to the court in

deciding this application. Moreover, the government proffered that one such witness, John Squitieri was a "day-to-day participant in the gambling operation" of the enterprise. T. 157. Squitieri's apparent willingness to lie and his own ties to the enterprise severely undermine any testimony he would give in support of Salerno.

■ Salerno's proffer of medical testimony is similarly unhelpful. Nowhere does Salerno claim that his vascular condition will affect his ability to run the Genovese Family enterprise if he is released. Nor is it claimed that his condition cannot be treated during detention. Indeed, the court has already directed the Warden of the Metropolitan Correctional Center to permit Salerno to receive his regular medication and to depart from its planned exercise program to permit Salerno to use an exercise bike twice a day, every day.

■ The proposed conditions of bail proffered by Salerno, characterized by defense counsel as "house arrest," are inadequate to control or diminish the danger posed to the community by Salerno. In fact, the proposed conditions closely parallel those found clearly erroneous in *United States v. Colombo, supra.*

Under the proposal, Salerno would be closely monitored by the Pretrial Services Agency, restricted to his home from 8:00 p.m. to 7:00 a.m., and limited in his ability to function during the remaining hours. Upon notice, he could travel within the State of New York for legal or medical purposes. He could also attend to business outside his residence with the permission of the Agency, but he would be prohibited from visiting his residence at 115th Street. He would also surrender any valid passports, associate with codefendants only in the presence of his attorney, and avoid the commission of crimes, including intimidation of witnesses.

As the Second Circuit made clear in *Colombo,* this examination of the intricacies of release is largely academic. The key point is that under these conditions, Salerno, like Colombo, is not prevented from doing the very thing that makes him a danger to the community: running his organized criminal enterprise. The Second Circuit in *Colombo* spoke almost directly to the case at bar:

> In our view, these conditions are clearly inadequate to protect the public from one found for bail purposes to be a danger to the community. Prohibiting [him] from associating with his co-defendants in no way prevents him from meeting with others who are members of a criminal enterprise. ... Prohibiting him from committing a crime or intimidating a witness does not at all impede his ability to do so, and requires no more of him than that which the law already demands from [him] and every other citizen. ... Finally, the fact that [he] must surrender his passport and post a bond tend merely to assure that he will not flee and do not relate to protection of the community. The particular danger ... is hardly alleviated by [these] type[s] of conditions.

*Colombo, supra,* 777 F.2d at 100. Accordingly, the government has established by clear and convincing proof that pretrial detention of Salerno is appropriate in this case.

■ The indictment alleges that defendant Cafaro is a captain, or "capo," in the Genovese Family. The evidence of Cafaro's violent character and present danger to the community is overwhelming. The government's proffer indicated that Cafaro manages the "enforcement" operations of the enterprise. In order to collect debts and enforce the "two-block" rule, Cafaro directs others, including "Artie," "Freddie," "Blood," "Pete" and his own son, to intimidate and frighten the public with threats of bodily harm and actual brute physical violence. He made such threats himself and, being in the possession of at least one automatic weapon and an Uzi machine gun, had the ability to carry them out. His own words intercepted by electronic surveillance, in which he repeatedly directed others to "knock [people's] f___g brains out," are indicative of Cafaro's propensity for violence. Thus, the government has, by clear and convincing proof, demonstrated that Cafaro has directed violent acts and is ready, willing and able to direct violent acts in the future.

The government, therefore, has met its burden of persuasion by clear and convincing evidence that no conditions of Cafaro's release would assure the safety of the community or of any person.

Cafaro joins in Salerno's arguments against detention. Those arguments have even less force with respect to Cafaro. Since he was not indicted in the "Commission" case, the government could not have sought detention earlier as to Cafaro. Moreover, apart from the indictment itself, the proffer as to Cafaro consisted entirely of unimpeachable tape evidence.

Cafaro's contention that his statements which were proffered by the government were merely "tough talk" is rejected by the court. The government has established by clear and convincing evidence that Cafaro was actually conducting the business of the enterprise and that he did so by directing others to commit violent acts.

■ Cafaro urges the court to consider releasing him on bail on the condition that he not be allowed to go to specified restaurants, social clubs, and offices, and that he surrender his passport, and not associate with other defendants. Such conditions of release would at most assure Cafaro's presence at trial. They in no way assure the safety of the community. Moreover, in view of the substantial evidence proffered, this court cannot envision any set of conditions that could ensure the safety of the community from Cafaro.

The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions. The illegal businesses, in place for many years, require constant attention and protection, or they will fail. Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose to the community is self-evident.

Thus, after carefully considering all the factors enumerated in 18 U.S.C. section 3142(g), this court finds that the government has met its burden of proof by clear and convincing evidence that no condition or combination of conditions of release of these defendants will reasonably assure the safety of any other person or of the community.

### ORDER

IT IS HEREBY ORDERED THAT defendants Salerno and Cafaro be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; that they be afforded reasonable opportunity for private consultation with their respective counsel; and that, on an order of a court of the United States or on the request of an attorney for the government, the person in charge of the correction facility in which they are confined deliver them to a United States marshal for the purpose of an appearance in connection with a court proceeding.

SO ORDERED.