*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0086P (6th Cir.)
File Name: 02a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

WAYNE COLEMAN,
  *Petitioner-Appellant,*

  *v.*

DON DEWITT, Warden,
  *Respondent-Appellee.*

No. 00-3688

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-00329—Algenon L. Marbley, District Judge.

Argued: October 24, 2001

Decided and Filed: March 12, 2002

Before: BOGGS and GILMAN, Circuit Judges; and
QUIST, District Judge.

———————————

**COUNSEL**

**ARGUED:** Melynda W. Cook-Reich, SCHAD & COOK, Indian Springs, Ohio, for Appellant. Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL,

_____

[*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Melynda W. Cook-Reich, SCHAD & COOK, Indian Springs, Ohio, for Appellant. Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, David M. Gormley, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee. Wayne Coleman, Chillicothe, Ohio, pro se.

----

## OPINION

----

BOGGS, Circuit Judge.    Wayne Coleman appeals the district court's denial of his petition for habeas corpus. In May 1997, Coleman was convicted by an Ohio state court of involuntary manslaughter and felonious assault, pursuant to a *nolo contendere* plea. Coleman had kicked Olivia Williams in the abdomen and otherwise had battered her. As a result of Coleman's violent actions, Williams suffered a miscarriage, leading to his conviction for involuntary manslaughter. Coleman argues that the manslaughter conviction violated his Fourteenth Amendment substantive due process rights under *Roe v. Wade*, 410 U.S. 113 (1973), and its progeny because the Ohio involuntary manslaughter statute did not require proof of the miscarried fetus's viability for conviction. He also argues that his nine-year sentence for the involuntary manslaughter count constitutes cruel and unusual punishment. For the following reasons, we affirm the district court's denial of his petition for habeas corpus.

## I

In the fall of 1996, Coleman was romantically involved with Olivia Williams. On October 4, 1996, Coleman, while physically abusing Williams, kicked her in the abdomen. At the time of the assault, Williams was pregnant, and Coleman's blow to Williams's abdomen caused her to miscarry.

## III

We therefore AFFIRM the judgment of the district court, denying Coleman's petition for a writ of habeas corpus.

Because Coleman's conviction does not transgress any reasonable interpretation of the Fourteenth Amendment, much less one clearly established by the Supreme Court of the United States, we affirm the district court's judgment finding Coleman's substantive due process argument without merit.

**B. Coleman's Cruel and Unusual Punishment Claim**

Coleman also argues that his sentence of nine years for involuntary manslaughter violates his Eighth Amendment right against cruel and unusual punishment.

The Eighth Amendment does forbid extreme sentences that are "grossly disproportionate to the crime." *See Harmelin v. Michigan*, 501 U.S. 957, 995 (1991). To determine whether a sentence is "grossly disproportionate," courts look to the gravity of the offense, including whether the crime was violent. *See id.* 1004-05 (Kennedy, concurring); *United States v. Hill*, 30 F.3d 48, 50-51 (6th Cir. 1994).

Coleman's sentence of nine years for involuntary manslaughter is far from the "gross disproportionality" required to offend the Eighth Amendment. Coleman's actions were violent and deprived Williams of her child, or at least the ability to exercise her rights over her pregnancy. At least as important as a woman's right to terminate her pregnancy is her right to choose to carry her child to term. In a jurisprudence that finds mandatory life sentences for the non-violent possession of cocaine constitutionally permissible, *see Harmelin*, 501 U.S. at 958, we would be hard-pressed to find nine years for Coleman's violent act beyond the constitutional pale. *Cf. Brown v. Mayle*, 2002 WL 187415 (9th Cir. 2002) (holding that a life sentence for non-violent petty theft through the application of California's "three strikes" statute violated the Eighth Amendment). Indeed, the Supreme Court has never held unconstitutional a sentence less severe than life imprisonment without the possibility of parole. *See Solem v. Helm*, 463 U.S. 277 (1983) (recognizing for the first time that non-capital sentences were subject to Eighth Amendment review).

Coleman was arrested five days later. On October 25, 1996, Coleman was indicted for felonious assault and involuntary manslaughter, pursuant to Ohio Rev. Code § 2903.04. The indictment alleged that Coleman committed involuntary manslaughter by "unlawfully terminat[ing] Olivia Williams' pregnancy, as a proximate result of . . . committing a felony."

Coleman pled no contest to the involuntary manslaughter and felonious assault counts. Pursuant to his plea, the Ohio trial court sentenced him to nine years of imprisonment for involuntary manslaughter, to run concurrently with a seven-year sentence for felonious assault.

Coleman appealed his conviction to the Ohio Court of Appeals, arguing that Ohio Rev. Code § 2903.04, the basis for his involuntary manslaughter conviction, was unconstitutional because it did not require proof of the terminated fetus's viability. The Ohio Court of Appeals affirmed his conviction, upholding the statute's constitutionality. Coleman then appealed to the Ohio Supreme Court, which summarily affirmed the Court of Appeals.

Coleman then filed a petition for habeas corpus in the United States District Court for the Southern District of Ohio. There, Coleman argued that his conviction and sentence for involuntary manslaughter violated both his Fourteenth Amendment substantive due process rights and his Eighth Amendment right to be free from cruel and unusual punishment. The district court found both arguments without merit and denied Coleman's petition for habeas corpus.

Coleman now appeals the district court's denial of his petition.

## II

In this case, our consideration of Coleman's petition for habeas corpus is limited by the Anti-Terrorism and Effective Death Penalty Act of 1996. The Act prohibits federal courts from issuing a writ of habeas corpus with respect to any claim

that was "adjudicated on the merits in the state court unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Ohio courts, in this case, decided against Coleman all the issues that he currently raises. Thus, Section 2254(d)(1) applies.

Coleman argues that the state may not prohibit the termination of a pregnancy before the viability of the fetus because of the Supreme Court's interpretation of the Fourteenth Amendment in *Roe v. Wade*, 410 U.S. 113 (1973). Accordingly, Coleman contends that his conviction for terminating Williams's pregnancy (even if as a result of committing a felony), without any proof of her fetus's viability, violated his rights under the Fourteenth Amendment. Also appealing his sentence, Coleman urges us in the alternative to hold that nine years for the manslaughter of a fetus is cruel and unusual punishment under the Eighth Amendment. We address each of his arguments separately below.

**A. Coleman's Substantive Due Process Claim**

Coleman argues that his conviction for involuntary manslaughter pursuant to Ohio Rev. Code § 2903.04 is unconstitutional because it violated the substantive due process rights announced in *Roe v. Wade* and its progeny. The relevant section of the Ohio code provides as follows: "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree." Ohio Rev. Code § 2903.04. Because the statute does not require the state to allege or to prove the viability of the terminated fetus, Coleman contends that the statute is beyond the state's prescriptive power under *Roe* and is therefore unconstitutional.

Coleman's argument misconceives the nature of the right established in *Roe*. Coleman sees *Roe* as an absolute

be attacked as overbroad."); *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 834 (6th Cir. 2001) ("It is well-settled that facial constitutional challenges relying on the overbreadth doctrine, and the resultant chilling effect such overbreadth has on speech, are limited to the First Amendment sphere."). Outside the First Amendment context, we will only uphold a facial challenge to a statute if the challenging party can demonstrate that there is no constitutional application of the statute. *United States v. Salerno*, 481 U.S. 739, 745-46 (1987); *Reno v. Flores*, 507 U.S. 292, 301 (1993) ("To prevail on such a facial challenge, the [challenging party] 'must establish that no set of circumstances exists under which the [statute] would be valid.'"). Of course, there is a constitutional application of the Ohio involuntary manslaughter statute – Coleman's case.[3]

Second, even if we were inclined to engage in an overbreadth analysis, the statute does not appear to reach *any* protected conduct. The statute prohibits the "*unlawful* termination of another's pregnancy as *a proximate result* of the offender's committing . . . a misdemeanor." To prevail, the state appears required to establish at least two elements under the statute: (1) that the termination of the pregnancy was "unlawful," and (2) that it was caused by the defendant's commission of a misdemeanor. We are not aware of any Ohio law that makes a woman's procuring of a consensual abortion a "misdemeanor," triggering the involuntary manslaughter statute. Moreover, such a consensual abortion very likely would not be "unlawful" as interpreted by Ohio courts. In this sense, the statute seems well-tailored to target activity, like Coleman's, that interferes with the woman's right to continue, or under certain limited circumstances to terminate, her pregnancy.

---

[3]Indeed, this is why facial constitutional challenges are universally unsuccessful as defenses to criminal prosecutions for non-expressive conduct. If the statute is constitutional as applied to the defendant's activities, it *a fortiorari* fails the *Salerno* standard.

her consent. Protecting the ability to exercise a fundamental right is a compelling state interest that would survive strict scrutiny even if it were required.

Coleman also haltingly argues that the statute is unconstitutionally overbroad in that it may, in addition to Coleman's conduct, also proscribe constitutionally protected conduct. Here, Coleman seeks to invalidate the manslaughter statute by invoking the rights of the woman whom he abused. There are two problems with Coleman's overbreadth argument, each independently fatal to his claim.

First, in the overbreadth doctrine, Coleman is trying to assert a feature of our First Amendment jurisprudence that is inapplicable to Coleman's Fourteenth Amendment argument. The overbreadth doctrine is an exception to the traditional rules of standing by allowing litigants to assert the rights of parties not before the court. *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 135 (6th Cir. 1994). *See also Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984) (holding that generally a litigant cannot assert the rights of third parties). In the free speech context, the overbreadth doctrine is designed "to prevent the chilling of future protected expression." *Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville*, 274 F.3d 377, 387 (6th Cir. 2001). Expressive conduct, as a constitutionally protected activity, is idiosyncratically sensitive to criminal sanctions and state regulation. *See New York v. Ferber*, 458 U.S. 747, 768-69 (1982). To avoid this recognized chilling effect, we have permitted those whose conduct is clearly unprotected to mount a facial challenge against a regulation that also substantially regulates protected conduct.

Neither the Supreme Court nor this court has applied the overbreadth doctrine when the First Amendment was not implicated. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("We have not recognized an overbreadth doctrine outside the limited context of the First Amendment"); *Schall v. Martin*, 467 U.S 253, 268 & n.18 (1984) ("Outside the limited First Amendment context, a criminal statute may not

prohibition on state regulation or protection of fetal health before viability. In *Roe*, the Supreme Court held that a woman's right to privacy, derived from the substantive components of the Fourteenth Amendment's Due Process Clause, includes a woman's right to decide whether or not to terminate her own pregnancy. Although the precise justification for the right has never been fully articulated, the right appears to rest, at least in part, on a pregnant woman's interest in self-determination and the profound effect that pregnancy has upon the woman. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 851 (O'Connor, plurality opinion) ("These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment."). To preserve this autonomy, the abortion right draws its constitutional essence from permitting the woman a decision regarding the fate of her pregnancy. The "essential holding of *Roe*" is a "recognition of the *right of the woman to choose* to have an abortion before viability and to obtain it without undue influence from the state." *Id.* at 846 (emphasis added).

The Court's creation of this right under the Fourteenth Amendment was not, however, a determination that the state has no prescriptive interest in matters involving the unborn. Quite to the contrary, the Court in *Roe* recognized that the state had important interests in protecting fetal life. *Roe*, 410 U.S. at 162-63 (holding that the state maintains "an important and legitimate interest in protecting the potentiality of human life"). The Court held that this important regulatory interest was not sufficiently "compelling" to support an absolute prohibition of abortion. The Texas statute criminalizing abortion at any stage in a woman's pregnancy, therefore, could not survive "strict scrutiny," under which the state must identify a "compelling state interest" motivating a regulation and employ only those means "narrowly tailored" to achieve that interest. *See id.* at 155-56.

In *Roe*, strict scrutiny was triggered by the woman's substantive due process right to decide the outcome of her pregnancy, an interest directly regulated by the Texas statute forbidding women from procuring abortions. While the woman's liberty interest in the abortion decision remains constant, the state's regulatory interest grows over the term of the pregnancy. At least according to the Court in *Roe*, the state's interest in protecting fetal life becomes "compelling," and thereby capable of surviving strict scrutiny, when the fetus becomes viable. *Id.* at 163.[1]

Ohio's interest in the protection of fetal life need not be compelling, however, to justify the application of the Ohio

---

[1] The protection of fetal life is not the only legitimate state interest in the regulation of abortion. The Court also recognized that the state has a legitimate interest in protecting the health of the mother, which becomes compelling after the first trimester of pregnancy. This interest would justify a variety of regulations on the manner in which abortions are performed. The combination of these two interests underlay the Court's trimester framework in *Roe*. Under the trimester framework, the state was allowed to adopt regulations narrowly tailored to protect the health of the mother after the first trimester, and regulations narrowly tailored to protect fetal health, including a complete proscription of abortions, except when necessary to preserve the life or health of the mother, after the second trimester. *See Roe*, 410 U.S. at 164-65. Because this trimester framework was not necessary to the Court's resolution of the case before it, it is not clear to what extent the framework has ever bound this court in its abortion decisions. *See Casey*, 505 U.S. at 860 (O'Connor, plurality opinion) ("We see how time has overtaken some of Roe's factual assumptions: advances in maternal health care allow abortions safe to the mother later in pregnancy than was true in 1973 and advances in neonatal care have advanced viability to a point somewhat earlier."); *Webster v. Reproductive Health Serv.*, 492 U.S. 490, 515-518 (1989) (Rehnquist, concurring) (suggesting the compelling state interest in fetal life, at least, shifts with medical technology and its effects on the point of viability). Thus, the Court in *Casey* held that even before viability, the state may advance its interest in fetal life by, for example, persuading women to carry their children to term, as long as it does not place an undue burden on the execution of the woman's decision. *Casey*, 505 U.S. at 876-78 (O'Connor, plurality opinion). In short, it is inaccurate for Coleman to argue that the state has no constitutionally sufficient interest in regulating fetal life before viability, even when directly limiting pregnant women's rights, much less his.

---

involuntary manslaughter statute to Coleman's actions.[2] Punishing Coleman's actions in no way implicates a *woman's* right to determine the disposition of *her* pregnancy recognized in *Roe* and its progeny. Coleman's violent assault was without the consent of his helpless girlfriend, Olivia Williams. It is Williams, the pregnant woman, who holds the limited right to terminate her pregnancy before viability, and Coleman may not invoke it on her behalf. The right recognized in *Roe* not being implicated, the state's interest in protecting the life of the unborn need not be "compelling" to sustain the regulation of Coleman's actions.

If we know anything from *Roe*, it is that the state has a legitimate and important interest in protecting fetal life throughout the pregnancy, even before viability. *Roe*, 410 U.S. at 162 (characterizing the state's interest in fetal health as "legitimate and important"); *Casey*, 505 U.S. at 846 (O'Connor, plurality opinion) (an "essential holding" of *Roe* "is the principle that the State has legitimate interests from the outset of the pregnancy in protecting . . . the life of the fetus that may become a child."). Ohio's pursuit of that legitimate, indeed important, interest, by criminalizing violent assaults on women that terminate fetal life, is certainly constitutional.

In light of the true meaning of *Roe*, Coleman's argument is fraught with irony. The Ohio involuntary manslaughter statute as applied to actions, like Coleman's, protects a woman's right to determine the fate of her pregnancy. The substantive due process right in *Roe* is a decisional right against governmental interference, which is meaningless when a private party terminates a woman's pregnancy without

---

[2] Of course, not every state regulation is subject to strict scrutiny. Instead, a state prescription is required to survive strict scrutiny only when the regulated activity is protected by "certain fundamental rights." *Id.* at 155. *See also Clark v. Jeter*, 486 U.S. 456, 461 (1988) (explaining the different levels of constitutional scrutiny). Absent a constitutional protection of the regulated activity, courts generally defer to the judgment of the enacting legislature, requiring only that the regulation be "rationally related" to a "legitimate" state interest. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).