# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON REMAND

## NO. 03-18-00759-CR

**Jessie Lee Brooks, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 20TH DISTRICT COURT OF MILAM COUNTY
### NO. CR25,688, THE HONORABLE JOHN YOUNGBLOOD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Jessie Lee Brooks Jr. was convicted by a jury of aggravated assault with a deadly weapon. *See* Tex. Penal Code § 22.02(a)(2). The trial court entered judgment on the verdict, assessing punishment at 30 years in prison and requiring him to pay several court costs or fees. In four appellate issues, he contends that (1) the evidence was insufficient to support the jury's finding that he threatened the victim, (2) the costs or fees are facially unconstitutional as violations of the Texas Constitution's separation of powers, (3) we should modify the trial court's Order to Withdraw Funds from his Inmate Trust Account, and (4) we should modify the judgment to correct clerical errors. We modify the judgment to correct the clerical errors and affirm it as modified.

# BACKGROUND

Lisa Grayson lived with Brooks, her boyfriend, in Cameron, Texas. According to her, as she was leaving for work one morning, Brooks attacked her. She believed that it started with his feeling jealous over her receiving money from her child's father, so he "jumped on" her, as he had done several times before, and beat her. She testified that when she went to her car that morning, he beat her with "a two-by-four" wooden board that he retrieved from the house. As he "beat [her] with a board," she tried to protect herself with her arms, and he kept hitting her. She testified: he "hit[] me to the point it knocked my tooth—yes—I mean, my tooth came out, the partial on my tooth." And further: "When I fell and like hit—like grabbed both of his hands and he like literally choked me real hard." During her testimony, she said that she "didn't even talk to Brooks that morning" of the assault. She also described prior assaults where Brooks "jumped" on her and beat her, including a prior assault over her children: "[H]e had like grabbed me by my neck and slammed me to the—to the passenger door. And then he like jumped me, and then—and then he like threatened me and just like—and he like jumped on me and cussing me and cussing me."

Grayson also testified that after the assault that was the subject of this prosecution, she had bruises all over her body and her fingers "were busted." She sought treatment at a Rockdale emergency room 15 to 20 minutes away, to hide from Brooks. She told the ER physician "that she was hit by her boyfriend with a two-by-four about the right arm, right forearm, [and] right hand." She also told the physician that she "had been choked the day before for about a minute," "had some chest-wall pain from some trauma," and "was hit the day before."

That night, Brooks reported to Cameron police that Grayson had returned to his house, broke its windows, and went back to Rockdale. Officer James Sherer, of the Cameron

2

Police Department, and a fellow officer offered to issue Grayson a trespass warning not to return to the house. Brooks agreed, so the officers contacted law enforcement in Rockdale to find her.

Law enforcement found Grayson in Rockdale during a traffic stop. She told Officer Sherer, who arrived later, that Brooks "struck [her] with a wooden board" and that she had not broken the windows of his house. She told other officers at the traffic stop about having been hit with the board. Several officers noticed bruising on her arm and hand, which she attributed to Brooks's attack with the board.

She also told Officer Sherer that during her several-month relationship with Brooks, she went to a hospital once in Temple, where, "they had to, like, bring me back to life" because Brooks had "choked the s— out of" her. She expressed that Brooks had a history of telling her that he would stop hitting her, and she believed him, but the abuse continued.

After the traffic stop, Grayson went to a Cameron police station and gave a handwritten statement, which was admitted into evidence. She described the attack:

> The night went to car to get a Advil so Jessie lock me out the house I was tryin to come get back in house. he grad my neck start choching me so hard I couldn't Breath the he grad A Board start hitting me with it so hard I told Jessie that he was hurting me so he told me I need to Hit. So he kept Hittin me with the Board the After tha he start hittin my fingurs till they Stard Bleeding

Officer Clayton Domel of the Cameron Police Department reviewed the statement and interviewed Grayson. She told him that there was an argument with Brooks during which Brooks "began to choke her." She said that she did not lose consciousness but "that she couldn't breathe and told him to stop." According to Officer Domel's description of Grayson's account, "at that point, [Brooks] quit choking her[,] and that's when he grabbed a piece of board, the two-by-four[,] from what she described[,] and began to strike her with it."

3

The State charged Brooks with two counts of assault, in separate indictments filed under separate cause numbers. One charged him with occlusion assault by intentionally or knowingly causing bodily injury to Grayson "by impeding the normal breathing or circulation of the blood . . . by applying pressure with hands to [her] throat and neck." The other charged him with intentionally or knowingly threatening her with imminent bodily injury "by telling her that he was going to end her life, and [he] did use or exhibit a deadly weapon during the commission of the assault, to wit: a piece of wood."

The cases proceeded to a jury trial, the State read both indictments to the jury, and Brooks pleaded not guilty to both offenses. The next day, before opening statements, the court addressed an issue "with regard to an amendment of the indictment." The record reflects that about two and a half months before trial, the State filed a Notice of Intention to Amend the Indictment, in which it sought to amend the assault-by-threat indictment by, among other things, deleting the phrase "by telling her that he was going to end her life." The parties disputed whether the indictment had been amended by the notice, which had not been acted on by the court. Ultimately, the trial court explained that trial would proceed on the original indictment as presented to the jury, implicitly denying the State's request to amend the indictment. While the judge seemed to agree with the State's argument that the phrase that it sought to delete was superfluous, he stated that "the State's burden is to prove the elements of the offense as charged and that's my ruling."

The jury charge for aggravated assault by threat contained no instructions relating to the verbal threat alleged in the indictment. In the abstract portion of the charge, the court defined "intentionally threaten another with imminent bodily injury" and "knowingly threaten another with imminent bodily injury" without reference to whether the threatening conduct was verbal or nonverbal. And over Brooks's objection, the application paragraphs omitted the phrase "by telling

4

her that he was going to end her life." The court simply instructed the jury to find Brooks guilty if the State had proved beyond a reasonable doubt the three elements that

1. the defendant . . . threatened imminent bodily injury to [Grayson];
2. the defendant did this –
   a. intentionally; or
   b. knowingly; and
3. the defendant, during the alleged assault, used or exhibited a deadly weapon, to wit: a piece of wood.

The jury acquitted Brooks of occlusion assault but found him guilty of aggravated assault by threat. This appeal followed.

On original submission, we reversed Brooks's conviction because we held that the State needed to prove a verbal threat because of the allegations in the indictment for assault by threat but that the State provided no evidence of any verbal threat. The Court of Criminal Appeals reversed our opinion and judgment, holding that the evidence of Brooks's "I need to hit" statement constituted evidence of a verbal threat by Brooks to Grayson. *See Brooks v. State*, 634 S.W.3d 745, 749 (Tex. Crim. App. 2021). The Court remanded to our Court for further proceedings consistent with its opinion. *See id.*

## DISCUSSION

### I. The evidence was sufficient, under the Court of Criminal Appeals' holding.

In his first issue, Brooks contends that the evidence was insufficient to support convicting him for assault by threat because the State did not prove the "threatens" element as it was charged in the indictment. *See* Tex. Penal Code §§ 22.01(a)(2), 22.02(a). He argues that the indictment's allegation that he "t[old] [Grayson] that he was going to end her life" required the State to prove a verbal threat even if the verbal or nonverbal character of a threat normally need

5

not be proven beyond a reasonable doubt to support a conviction for assault by threat. Brooks says that the threat element is the only element that he challenges.

Assuming that the State needed to prove a verbal threat as Brooks argues, because the Court of Criminal Appeals has held that the evidence of Brooks's "I need to hit" statement to Grayson sufficed to prove a verbal threat under the circumstances, *see Brooks*, 634 S.W.3d at 749, we have no choice but to hold that the evidence was sufficient to support the only element of the offense that Brooks challenges. We thus overrule his first issue.

## II.     The costs or fees that Brooks challenges are facially constitutional.

In his second issue, Brooks contends that five costs or fees assessed against him by the trial court under various statutes "are facially unconstitutional because they violate the Separation of Powers provision of the Texas Constitution." He contests (1) the full amount of a $40 clerk's fee, (2) the full amount of a $4 jury-reimbursement fee, (3) 10% of a $2 indigent-defense fee, (4) the full amount of a $4 administrative-transaction fee, and (5) the full amount of a $35 serving-writ fee.

Brooks raises "the most difficult challenge to mount successfully"—a facial attack on the constitutionality of a statute. *Allen v. State*, 614 S.W.3d 736, 741 (Tex. Crim. App. 2019) (internal quotation omitted) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). To prevail, he must show that "no set of circumstances exists under which [the] statute would be valid." *Id.* (internal quotation omitted) (quoting *Peraza v. State*, 467 S.W.3d 508, 514 (Tex. Crim. App. 2015)). "[A]ny possible constitutional application of the statute" at issue defeats Brooks's challenge. *Id.* We must (i) presume that the statutes that Brooks attacks are constitutional, (ii) seek

to interpret them to support their constitutionality, and (iii) make every reasonable presumption in favor of constitutionality unless the contrary is clearly shown. *See id.* at 740.

There are two types of constitutionally permissible costs or fees imposed by courts on convicted defendants: "(1) those that reimburse criminal justice expenses incurred in connection with the defendant's particular criminal prosecution, and (2) those that are to be expended to offset future criminal justice costs." *Id.* at 744. For the second type, "a statute assessing costs for future expenses (or an interconnected statute) must expressly direct the collected fees to be expended for a legitimate criminal justice purpose" to be constitutional. *Id.* (citing *Salinas v. State*, 523 S.W.3d 103, 107 (Tex. Crim. App. 2017)). But for the first type, the focus is whether the statute creating the cost or fee "seeks to recoup expenses legitimately incurred in connection with the prosecution of a defendant's criminal case," for that feature alone brings the statute within the judicial branch's proper function. *Id.* at 745. "And this is true without reference to where the funds are directed or what they are ultimately used for once collected." *Id.*

For type-two costs or fees, deciding whether a legitimate criminal-justice purpose is at issue is a statute-by-statute and case-by-case question that turns on "what the governing statute says about the intended use of the funds, not whether funds are actually used for a criminal justice purpose." *Salinas*, 523 S.W.3d at 107. Applying that standard, the Court of Criminal Appeals has held that "a general appropriation of money to" the state Health and Human Services Commission was not "an allocation of funds 'to be expended for legitimate criminal justice purposes'" in large part because the statute at issue made no mention at all of any criminal-justice purpose. *Id.* at 108–09. The Court similarly held that directing funds to the state's General Revenue Fund was not "an allocation of funds 'to be expended for legitimate criminal justice purposes.'" *Id.* at 110.

7

## A.      $40 clerk's fee

The parties agree that former article 102.005(c) of the Code of Criminal Procedure authorized the $40 clerk's fee imposed on Brooks.  *See* Act of May 27, 1995, 74th Leg., R.S., ch. 764, § 1, 1995 Tex. Gen. Laws 3969, 3969 (repealed 2020).  Before its repeal, the statute provided that its fee was "for all clerical duties performed by the clerk" and listed as examples duties that the clerk would undertake when working on the particular defendant's own criminal case.  *See id.*  At least two of our sister courts have held that these features made the statute constitutional, and in one case specifically, because the statute's purposes were to seek recoupment of expenses incurred as part of the prosecution of the defendant's particular criminal case.  *See Moliere v. State*, 574 S.W.3d 21, 31–32 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd); *Davis v. State*, 519 S.W.3d 251, 257 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).  We are persuaded that *Moliere* and *Davis* correctly upheld the constitutionality of the now-repealed statute under the law as explained in *Allen*.  We thus overrule this part of Brooks's second issue.[1]

## B.      $4 jury-reimbursement fee

The parties agree that former article 102.0045 of the Code of Criminal Procedure authorized the $4 jury-reimbursement fee imposed on Brooks.  *See* Act of May 27, 2005, 79th Leg., R.S., ch. 1360, § 5, 2005 Tex. Gen. Laws 4255, 4256 (repealed 2020).  Before its repeal, the

---

[1]  In nonprecedential opinions, our Court and the Fifth Court of Appeals have upheld the statute's constitutionality against separation-of-powers attacks like Brooks's.  *See Wells v. State*, No. 03-18-00675-CR, 2021 WL 3233855, at *1 (Tex. App.—Austin July 30, 2021, no pet.) (mem. op., not designated for publication) (relying on *Wells v. State*, No. 03-18-00675-CR, 2020 WL 3164972, at *4 (Tex. App.—Austin June 4, 2020) (mem. op., not designated for publication), *judgm't vacated on other grounds*, No. PD-0579-20, 2021 WL 1936068 (Tex. Crim. App. May 12, 2021) (per curiam) (not designated for publication)); *Thornton v. State*, No. 05-17-00220-CR, 2018 WL 2773390, at *2–3 (Tex. App.—Dallas June 11, 2018, no pet.) (mem. op., not designated for publication).

statute provided that its fee was "to be used to reimburse counties for the cost of juror services as provided by Section 61.0015, Government Code." *Id.* Once the fee was collected from the convicted defendant by the court clerk, the clerk would send the funds to the Comptroller of Public Accounts to be deposited into a jury-service fund in the state treasury. *See id.*; Tex. Gov't Code §§ 61.001, 61.0015. From that fund, and upon quarterly claims for reimbursement from any given county, the Comptroller would pay the claimant county about 85% of the funds needed to reimburse jurors for their service in that county. *See* Tex. Gov't Code §§ 61.001, 61.0015. Because the funds collected under former Article 102.0045, and paid out under Section 61.0015, reimburse counties for juror services, which necessarily includes services for juries in criminal trials, the fee is directly related to expenses for legitimate criminal-justice purposes. *See Allen*, 614 S.W.3d at 744; *Salinas*, 523 S.W.3d at 107; *Johnson v. State*, 573 S.W.3d 328, 337 (Tex. App.—Houston [14th Dist.] 2019), *judgm't vacated on other grounds*, No. PD-0246-19, 2021 WL 1939984 (Tex. Crim. App. May 12, 2021) (not designated for publication). We overrule this part of Brooks's second issue.[2]

### C. 10% of $2 indigent-defense fee

The parties agree that former section 133.107 of the Local Government Code authorized the $2 indigent-defense fee imposed on Brooks. *See* Act of May 27, 2007, 80th Leg., R.S., ch. 1014, § 6, 2007 Tex. Gen. Laws 3540, 3542 (repealed 2020). Before its repeal, the statute provided that the fee was "to be used to fund indigent defense representation." *Id.* Brooks's

---

[2] We have reached a similar conclusion, in a nonprecedential opinion. *See Wells*, 2021 WL 3233855, at *1 (relying on *Wells*, 2020 WL 3164972, at *5 (citing *Johnson v. State*, 573 S.W.3d 328, 337 (Tex. App.—Houston [14th Dist.] 2019), *judgm't vacated on other grounds*, No. PD-0246-19, 2021 WL 1939984 (Tex. Crim. App. May 12, 2021) (per curiam) (not designated for publication))).

challenge is not to the whole fee but to 10% of it because, under nearby provisions of the Local Government Code, a county could keep 10% of the indigent-defense fee "as a service fee" for collecting the indigent-defense fee. *See* Tex. Loc. Gov't Code §§ 133.055(a), 133.058(a). But we are to decide this issue based on "what the governing statute says about the intended use of the funds, not whether funds are actually used for a criminal justice purpose." *See Salinas*, 523 S.W.3d at 107. The governing statute, former Section 133.107, says that indigent defense was the intended use of the funds. No matter whether counties had an option to keep 10% of the funds, the funds' intended use remained the funding of indigent-defense representation. Since keeping 10% was optional, a county could elect not to keep anything, thus defeating the facial-unconstitutionality attack. *See Allen*, 614 S.W.3d at 740–41. We conclude that this fee, including the 10% that Brooks challenges, was for expenses for legitimate criminal-justice purposes. *See id.* at 744; *Salinas*, 523 S.W.3d at 107. We thus overrule this part of his second issue.

### D. *$4 administrative-transaction fee*

The parties agree that Code of Criminal Procedure article 102.072 authorizes the $4 administrative-transaction fee imposed on Brooks. It provides that certain officers or entities[3] "may assess an administrative fee for each transaction made by the officer or department relating to the collection of fines, fees, restitution, or other costs imposed by a court." Tex. Code Crim. Proc. art. 102.072. The fee is imposed by virtue of a defendant's conviction and therefore is attendant to a criminal court proceeding. *Johnson*, 573 S.W.3d at 339 (citing *Armstrong v. State*, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011) ("[C]ourt costs are compensatory in nature; that is,

---

[3] The officers or entities include district and county attorneys, clerks of district and county courts, sheriffs, constables, justices of the peace, and community-supervision and corrections departments. *See* Tex. Code Crim. Proc. arts. 102.072, 103.003(a).

they are 'a nonpunitive recoupment of the costs of judicial resources expended in connection with the trial of the case.'")). The fee is thus directly tied to reimbursement for judicial expenses incurred in a defendant's particular case and therefore is constitutional as a type-one fee. *See Allen*, 614 S.W.3d at 744–45. We overrule this part of Brooks's second issue.

### E. $35 serving-writ fee

Brooks posits that Code of Criminal Procedure article 102.011(a)(4) authorizes this fee, and the State provides nothing to dispute this. That statute provides that a convicted defendant should pay $35 "to defray the cost of the services provided *in the case* by a peace officer . . . for serving a writ not otherwise listed in this article." Tex. Code Crim. Proc. art. 102.011(a)(4) (emphasis added). The statute plainly applies to recouping expenses incurred as part of the prosecution of the defendant's particular criminal case and so is constitutional as a type-one fee. *See Allen*, 614 S.W.3d at 745. We thus overrule the rest of Brooks's second issue.

In Brooks's third issue, he seeks modification of the trial court's Order to Withdraw Funds as the remedy for his challenges to the costs or fees addressed above. Because we overrule Brooks's second issue, we also overrule his third.

## III. The judgment must be modified to correct certain clerical errors.

In his fourth issue, Brooks contends that we should modify the trial court's judgment to correct certain clerical errors. The State agrees with Brooks on these items. We have before us the information necessary to make the appropriate modifications to the notations of the offense level and Brooks's pleas to the enhancement paragraphs, both as stated in the judgment. We therefore sustain Brooks's fourth issue and modify the trial court's judgment in these ways:

11

(1) The notation of "**1ST DEGREE FELONY**" under the heading "<u>Degree of Offense:</u>" is deleted and replaced with the notation "**2ND DEGREE FELONY**".

(2) The notations of "**TRUE**" under each of the headings "Plea to 1st Enhancement Paragraph:" and "Plea to 2nd Enhancement/Habitual Paragraph:" are deleted and replaced with notations of "**NOT TRUE**".

*See* Tex. R. App. P. 43.2(b) (court of appeals may modify trial court's judgment and affirm it as modified); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993) (same).

## CONCLUSION

We modify the trial court's judgment as set forth above and affirm it as modified.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Modified and, as Modified, Affirmed on Remand

Filed:  March 17, 2022

Do Not Publish

12