

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00045-CR

———————————————

EX PARTE BRUCE ALLEN HANSON

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. DC30-CV2022-0173

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth
Dissenting Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

Appellant Bruce Allen Hanson is being held for allegedly murdering his wife, and his bail is set at $1 million. Hanson filed a pretrial application for writ of habeas corpus seeking a reduction of his bail, but the trial court denied Hanson's requested reduction. Because we conclude that the trial court abused its discretion by doing so, we will reverse and remand to that court to set a reasonable bail.

## I. Governing Law and Standard of Review

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755, 107 S. Ct. 2095, 2105 (1987). Accordingly, the federal and state constitutions both prohibit the imposition of "[e]xcessive bail." U.S. Const. amend. VIII; Tex. Const. art. I, § 13; *see* Tex. Const. art. I, § 11. Bail is excessive if it is "set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Ex Parte Peyton*, No. 02-16-00029-CR, 2016 WL 2586698, at *3 (Tex. App.—Fort Worth May 5, 2016) (mem. op., not designated for publication), *pet. dism'd*, No. PD-0677-16, 2017 WL 1089960 (Tex. Crim. App. Mar. 22, 2017) (not designated for publication). The government's primary interest, and bail's primary purpose, is to give reasonable assurance of the defendant's presence at trial. *See* Tex. Code Crim. Proc. Ann. art. 17.01; *Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977); *cf. Ex parte Briscoe*, No. 02-15-00223-CR, 2015 WL 5893470, at *3 (Tex. App.—Fort Worth Oct. 8, 2015, no pet.) (mem. op., not designated for publication) (recognizing that giving

2

"reasonable assurance" is not equivalent "to 'guarantee[ing]' a defendant's appearance at trial," as such a guarantee "cannot be done except by abolishing the right to bail" (quoting *Ex parte Bogia*, 56 S.W.3d 835, 840 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

In setting bail, the trial court must balance the defendant's presumption of innocence with the State's interest in assuring the defendant's presence at trial. *See Ex parte Simpson*, 77 S.W.3d 894, 896 (Tex. App.—Tyler 2002, no pet.) (per curiam); *see also Briscoe*, 2015 WL 5893470, at *3 (noting that "a bail that cannot be satisfied has the potential to displace the presumption of innocence"). This is a fact-driven determination that must be decided on the unique facts of each case. *Ex parte Carter*, 621 S.W.3d 355, 361 (Tex. App.—San Antonio 2021, no pet.); *Ex parte Cook*, No. 02-18-00537-CR, 2019 WL 2323643, at *3 (Tex. App.—Fort Worth May 31, 2019, no pet.) (per curiam) (mem. op., not designated for publication).

The trial court's discretion in setting a bail amount is "governed by the Constitution and the following rules:

> 1. Bail and any conditions of bail shall be sufficient to give reasonable assurance that the undertaking will be complied with.
>
> 2. The power to require bail is not to be used to make bail an instrument of oppression.
>
> 3. The nature of the offense and the circumstances under which the offense was committed are to be considered, including whether the offense: (A) is an offense involving violence as defined by Article 17.03; or (B) involves violence directed against a peace officer.

4. The ability to make bail shall be considered, and proof may be taken on this point.

5. The future safety of a victim of the alleged offense, law enforcement, and the community shall be considered.

6. The criminal history record information for the defendant . . . shall be considered, including any acts of family violence, other pending criminal charges, and any instances in which the defendant failed to appear in court following release on bail.

7. The citizenship status of the defendant shall be considered.

Tex. Code Crim. Proc. Ann. art. 17.15(a) (indentation altered).[1]  The Court of Criminal Appeals has identified other factors to be considered as well—commonly referred to as the *Rubac* factors—which include the defendant's work record, his family and community ties, and his length of residency. *Ex parte Rubac*, 611 S.W.2d 848, 849–50 (Tex. Crim. App. 1981) (also listing many factors reflected in the current version of Article 17.15, including the defendant's prior criminal record, his conformity with previous bail conditions, the charged offense's aggravating circumstances, and the accused's ability to make bail).

We review the trial court's bail determination for an abuse of discretion, viewing the evidence in the light most favorable to the trial court's decision. *Ex parte Gomez*, 624 S.W.3d 573, 576 (Tex. Crim. App. 2021).  We will not disturb the decision

---

[1]The factors listed in Article 17.15 were modified during the 87th Legislative Session, with the amendments taking effect December 2, 2021. *See* Act of Aug. 31, 2021, 87th Leg., 2d C.S., S.B. 6, § 10(a) (codified at Tex. Code Crim. Proc. Ann. art. 17.15) (modifying factors one through five and adding factors six and seven).

4

if it is within the zone of reasonable disagreement. *Ex parte Estrada*, 640 S.W.3d 246, 250, 256 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). The accused has the burden to show that the bail amount is excessive. *Gomez*, 624 S.W.3d at 576.

## II. Analysis

At the hearing on Hanson's habeas petition, the State argued that his $1 million bail is reasonable given "the strength of the State's case" for murder, Hanson's "misrepresented" and "significant" criminal history, and Hanson's "considerable resources." While the details of Hanson's alleged offense do indeed weigh in favor of a high bail amount, Hanson's history and resources do not. Nor does much of the other evidence in the record.

Hanson presented evidence that he has had no criminal arrests or convictions in the last 30 years; that his decades-old offenses were not violent ones; that he does not present an identifiable risk to the community; that the risk of his flight is minimal due to his age, disability, and longstanding ties to the community; that he relies on social security income; and that he has limited assets at his disposal. Based on the proffered evidence, the $1 million bail amount is unnecessarily high to serve the government's interests and reasonably assure Hanson's presence at trial.

### A. Nature of the Offense and Potential Sentence (Factors 1 and 3)

The nature of the defendant's alleged offense and the length of his potential sentence are the "primary factors" we consider in evaluating a bail decision. *Ex parte Hunt*, 138 S.W.3d 503, 506 (Tex. App.—Fort Worth 2004, pets. ref'd); *see* Tex. Code

5

Crim. Proc. Ann. art. 17.15(a)(3). Hanson's alleged offense is troubling, and his potential sentence is severe.

Hanson is charged with murdering his wife. *See* Tex. Penal Code Ann. § 19.02. Murder is a first-degree felony, and needless to say, it is a violent crime. *See id.* § 19.02(c); Tex. Code Crim. Proc. Ann. art. 17.03(b-3)(2)(A). And the manner of Hanson's wife's death—death by gunshot—was certainly violent.

According to the affidavit that accompanied Hanson's arrest warrant and that was admitted into evidence at Hanson's habeas hearing, Hanson called 911 to report that his wife had shot herself. When law enforcement officers and first responders arrived at the couple's home, they found Hanson's wife in the bedroom, nude from the waist down, with a "handgun with a noticeable malfunction under [her] left leg." Hanson appeared intoxicated and stated that he and his wife had been celebrating a birthday, that she went into the bedroom to take a nap, and that sometime later, Hanson heard a shot and found her dead.

Hanson initially insisted that he called 911 right after his wife died. But when officers began to process the scene, the decedent's body was already cold to the touch and the blood had coagulated under her head, showing signs that she had died earlier in the day. Hanson later revised his statement and told officers that his wife had, in fact, died earlier in the day.

And this was not the only inconsistency in Hanson's version of events. He initially denied that he had been in the room when his wife was shot and that he had

touched her body afterward, but he later stated that he had witnessed the incident and admitted to having covered her with a towel. Hanson also claimed that he had tried to call 911 multiple times to report his wife's death, but the dispatcher received just one call from his number, and his cell phone showed just that single 911 call. Hanson's DNA was found under his wife's nails, gunshot residue was found on his hands, and his wife's blood was found splattered on a pair of shorts that Hanson had been photographed wearing earlier in the day. But Hanson denied having marital problems "outside of a few arguments," he denied having handled a firearm for weeks, and he denied having changed clothes that day.

The decedent's two children told the investigating officers that Hanson was abusive and that the decedent had been taking steps to move out. A search of Hanson's cell phone confirmed that he knew his wife had been planning to move out, but Hanson denied such knowledge.

The autopsy revealed that Hanson's wife had a gunshot wound "that was not a contact wound,"[2] that "went from right to left, slightly back to front and upward," that lacked soot around it, and that had a "very spread out" stippling pattern. Based on these autopsy findings, the affiant officer stated that his training and experience led him to conclude the decedent could not have shot herself.

---

[2]The affiant officer stated that a contact wound is what "would have been expected in a suicide."

The trial court admitted this affidavit into evidence at Hanson's habeas hearing, along with photographs of the crime scene and decedent. The State also offered a scholarly medical resource regarding self-inflicted gunshot wounds.

The facts alleged in the State's affidavit are disturbing and reveal "a senseless death—the question being whether it was a criminal act" or a suicide. *Cook*, 2019 WL 2323643, at *3 (analyzing $750,000 bail of defendant who allegedly murdered his girlfriend). If the facts alleged in the affidavit are proven at trial and the decedent's shooting is found to have been a murder, Hanson faces a potential punishment range from 5 years to 99 years or life in prison. *See* Tex. Penal Code Ann. § 12.32. Such a serious offense and potentially lengthy sentence heighten "the importance of setting bail sufficiently high to secure [Hanson's] appearance at trial." *Ex parte Rotter*, No. 02-21-00016-CR, 2021 WL 2006313, at *3 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op., not designated for publication) (affirming $750,000 bail for murder); *see Ex parte Scott*, 122 S.W.3d 866, 869 (Tex. App.—Fort Worth 2003, no pet.) (recognizing that "the accused's reaction to the prospect of a lengthy sentence might be to not appear").

This factor weighs in favor of a high bail amount, "yet not one that is unreasonable." *Cook*, 2019 WL 2323643 at *3; *see Peyton*, 2016 WL 2586698, at *5 (holding $1 million bail excessive for defendant accused of solicitation to commit capital murder).

**B. Criminal History (Factor 6)**

A court must also consider "[t]he criminal history record information for the defendant." Tex. Code Crim. Proc. Ann. art. 17.15(a)(6). A defendant's criminal history can suggest that the defendant would be a danger to the public if released on bail. *See, e.g.*, *Ex parte Lovell*, No. 12-21-00206-CR, 2022 WL 598683, at *3 (Tex. App.—Tyler Feb. 28, 2022, no pet.) (mem. op, not designated for publication) (considering history of driving while intoxicated (DWI) offenses in analysis of $250,000 bail for defendant accused of felony DWI). Here, though, Hanson's criminal history does not suggest that he would be a danger.

Hanson testified to three prior arrests or convictions: a DWI conviction in 1987, a DWI arrest in 1990, and an arrest for theft of oilfield property in 1990.[3] Hanson initially testified that he had only been arrested once—for the 1987 DWI— but when confronted with his other arrests on cross-examination, he admitted them and explained that he had not mentioned them initially because the 1987 DWI was the only arrest that had appeared on his police record when he applied for a concealed handgun license (CHL) in 2010. The State argued that this was an intentional misrepresentation and that Hanson's "criminal history [wa]s more significant than was initially le[t] on."

---

[3]The State also asked about an unspecified arrest in 1992, but Hanson stated that he did not "know what that's about," and the State did not offer any contradicting evidence that the arrest had occurred.

Even assuming the trial court interpreted Hanson's purported confusion as an intentional misrepresentation, though, his criminal history is nonetheless insignificant because Hanson has had no arrests or convictions in the last 30 years, and none of his decades-old arrests were for violent offenses. *But cf. Lovell*, 2022 WL 598683, at *3 (recognizing that "[a] trial court may reasonably find that a defendant poses a danger to the community based on a history of drunk driving and consider it a compelling factor in setting his bail" where defendant was being held for felony DWI). His criminal history does not indicate that he would be a danger to the public. *See Peyton*, 2016 WL 2586698, at *5 (holding $1 million bail excessive where defendant was charged with solicitation to commit capital murder but had no prior felony convictions).

This factor weighs in favor of a lower bail amount.

## C. Safety Risk (Factor 5)

Another consideration in the bail analysis is the danger the defendant presents to the victim and to the community. Tex. Code Crim. Proc. Ann. art. 17.15(a)(5). The allegation that Hanson committed murder raises a generalized safety concern, but there is no evidence that Hanson poses an identifiable threat to any members of the community.

Although the decedent's children told law enforcement officers that Hanson had physically abused their mother, the State did not highlight or develop these hearsay allegations at the hearing, and the alleged victim of Hanson's abuse, the

decedent, is no longer in danger from him. Moreover, Hanson confirmed that he is willing to comply with reasonable bail conditions, even if the conditions prohibit him from drinking alcohol, require him to wear a device that would detect alcohol on his skin, require him to mail in his CHL, or order him to surrender his firearms.[4] *Cf. Ex parte Taylor*, No. 02-20-00010-CR, 2020 WL 1963788, at *7 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (per curiam) (mem. op., not designated for publication) (noting ability to use bail conditions to protect the community and holding that trial court abused its discretion by refusing to reduce $500,000 bail for defendant accused of aggravated robbery).

"This factor, while difficult to analyze, reflects that the high amount of [Hanson's] bail is not sufficiently related to community safety." *Peyton*, 2016 WL 2586698, at *5 (holding $1 million bail excessive where defendant was charged with solicitation to commit capital murder but bail conditions prohibited contact with victim and victim's family).

## D. Flight Risk (Factors 1 and 7)

Again, "[t]he primary purpose in setting a bail amount and the first listed factor in [A]rticle 17.15 is the reasonable assurance that the applicant will appear for court."

---

[4]Hanson testified that the Wichita Falls Police Department had already seized all of his firearms, so there were no remaining firearms in his home. But if the police missed any firearms, Hanson agreed to surrender them.

*Id.* at *4; *see* Tex. Code Crim. Proc. Ann. art. 17.15(a)(1). The State thus attempted to elicit evidence that Hanson was a flight risk.

The prosecutor asked Hanson why he was wearing a pink jail uniform and was in a solitary cell instead of in the general jail population, suggesting that "the notes on the jail screen" described Hanson as an escape risk. But the prosecutor's suggestive questions are not evidence, and Hanson responded to these questions by stating he did not know why he was wearing pink or in solitary. There was ultimately no evidence offered to explain the rationale for or significance of Hanson's jail uniform or placement, nor was there any evidence offered to substantiate the alluded-to "notes on the jail screen." Hanson testified that he was not an escape risk, and the prosecutor introduced no evidence to the contrary.

Instead, Hanson testified to his community ties. He stated that he is 64 years old, and although he has no family in Wichita County—his only family is his brother, who lives in Montana—Hanson has lived in the Wichita County area continuously since 1981, and he owns a home there. He worked in the community as a machinist for approximately 10 years and then as a project planner for 14 years before retiring in 2019. He is now disabled and relies on social security income.

Hanson's homeownership and 40-year roots in Wichita County are strong indicators that he is unlikely to flee. Although neither party offered evidence of Hanson's citizenship status, his community ties and reliance on social security income demonstrate more than a transient connection to the county and to this country. *See*

Tex. Code Crim. Proc. Ann art. 17.15(a)(7) (directing courts to consider citizenship status in bail analysis). His age and disability minimize the likelihood of flight as well. And the State presented no evidence that Hanson had violated prior bail conditions or had failed to appear in the past.[5] *See id.* art. 17.15(a)(6).

Given the evidence of Hanson's relatively low flight risk, any lingering flight concerns could be quelled with bail conditions. Hanson confirmed that he is willing to comply with reasonable bail conditions, even if, as the State proposed, Hanson is required to wear an electronic monitoring device[6] and confined to his house with only a small window of time to purchase groceries and find employment to pay for the electronic monitoring device.[7]

This factor weighs in favor of a lower bail amount.

---

[5]Hanson testified that, other than his DWI conviction in the 1980s, he had not been released on any other bonds, and the State presented no evidence to the contrary.

[6]Hanson expressed concern regarding the monthly cost of the potential alcohol detection device and electronic monitoring device but confirmed that his concern was solely financial and that he would wear them if the devices were provided to him.

[7]When asked about house arrest, Hanson expressed concern that he would not be able to get food, but he testified that he would have no problem if permitted a short window of time to get groceries. At the end of the hearing, the State requested that, if Hanson were to be released on bail, such release be "subject to restrictions on his movements, especially staying in Wichita County, and only being allowed to leave his home for work so he can afford these devices or to do necessary household duties during a particular time."

**E. Ability to Make Bail (Factors 2 and 4)**

"The [defendant's] ability to make bail shall [also] be considered," and bail may not be set so high as to be "an instrument of oppression." Tex. Code Crim. Proc. Ann. art. 17.15(a)(2), (a)(4). Whether bail is oppressive or not depends on the defendant's financial circumstances; bail is considered oppressive if it is set in an amount higher than the defendant can afford for the express purpose of forcing him to remain incarcerated pretrial. *Ex parte Johnson*, No. 05-21-00049-CR, 2021 WL 5822838, at *7 (Tex. App.—Dallas Dec. 8, 2021, pet. ref'd) (mem. op., not designated for publication). Hanson offered evidence that the $1 million bail is higher than he can afford and that the high amount will force him to remain incarcerated.

Farrah Hoffman, a bail bondsman, testified that making a $1 million bail would require the defendant to pay "between [$]250,000 and [$]350,000." She estimated that, for a bondsman to post a $1 million bail in Wichita County, the offender would need to put up "ten percent, which would be [$]100,000, plus [the bondsman] would get collateral on top of that, which would be, usually, [$]250,000," plus the bondsman would require cosigners. If the offender had no cosigners, the collateral could go "up to half of the amount of the bond."[8]

Hanson testified that he does not have access to $250,000 or $350,000. He supports himself using his social security income, which is "slightly less than [$]1,600"

---

[8]Hoffman testified that no one had talked with her about the possibility of posting Hanson's bail.

a month. Asked to put a dollar figure on his estate, not counting his house, he estimated that he had "somewhere between" $100,000 and $150,000, mostly in his 401K retirement account,[9] and he testified that he owns two cars—a 2016 Kia and a 2010 Hyundai. Hanson guessed that his house was worth "more than [$]100,000," but he did not know how much, and he described it as "an older home that needs a lot of work done." There was no evidence of any other liquid assets that Hanson can use to reach the $250,000 or $350,000 figure. Even his two credit cards have credit limits of $1,000 and $4,000 respectively. Hanson thus testified that he can afford a bail of only "around 100[,000]."

Hanson admitted, though, that neither he nor his brother have attempted to make the $1,000,000 bail and that he has not tried to secure a loan for the bail amount. Generally, a defendant must exhaust his resources and attempt to make the bail before complaining that he cannot do so. *See Milner v. State*, 263 S.W.3d 146, 149 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Unless he has shown that his funds and those of his family have been exhausted, a defendant must usually show that he made an unsuccessful effort to furnish bail before bail can be determined to be excessive."); *cf. Ex parte Payten*, No. 02-13-00447-CR, 2013 WL 5968449, at *3 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (per curiam) (mem. op., not designated for publication) (stating appellant's "testimony that one bondsman told him that no

---

[9]Hanson had given his brother his power of attorney to manage his finances while he was in custody, so he was "not sure what is going in or what is going out."

bondsman would write a bond in the amount of $750,000 does not alone make the amount excessive"). But when the uncontradicted evidence demonstrates the defendant's financial inability to make the bail, "we will not require him to do a 'useless thing.'" *Ex parte Dueitt*, 529 S.W.2d 531, 532 (Tex. Crim. App. 1975) (quoting *Ex parte Skinner*, 496 S.W.2d 633, 634 (Tex. Crim. App. 1973)); *see Milner*, 263 S.W.3d at 149–50 (similar).

Here, the uncontradicted evidence demonstrates that Hanson lacks the resources to make the $1 million bail; there is an "enormous gap between what bail [Hanson] said could be afforded and what bail the trial court actually set." *Estrada*, 640 S.W.3d at 255 (weighing factor in favor of bail reduction where defendant's family testified they could only provide $20,000 to $25,000 but trial court set bail at a combined $900,000); *cf. Taylor*, 2020 WL 1963788, at *5–6 (holding $500,000 bail oppressive despite defendant's failure to exhaust his and his family's funds). Even if Hanson took everything out of his retirement account, sold his two vehicles, sold his home, and moved onto the street, he would need cosigners to satisfy a bondsman, and he might still come up short.

A defendant's inability to meet the bail set by the trial court does not automatically make the bail amount excessive—"[i]f the ability to make bond in a specified amount controlled, then the role of the trial court in setting bond would be completely eliminated, and the accused would be in the unique posture of determining what his bond should be." *Scott*, 122 S.W.3d at 870 (quoting *Ex parte Miller,* 631

16

S.W.2d 825, 827 (Tex. App.—Fort Worth 1982, pet. ref'd)). But it is nonetheless a consideration, and a weighty one at that. A bail that is far beyond the defendant's ability to make "displac[es] the presumption of innocence and serv[es] as an instrument of oppression." *Taylor*, 2020 WL 1963788, at \*6 (holding $500,000 bail excessive where defendant was accused of first-degree felony aggravated robbery); *see Peyton*, 2016 WL 2586698, at \*6 (holding $1 million bail excessive when defendant was accused of solicitation to commit capital murder); *Briscoe*, 2015 WL 5893470, at \*3–5 (holding $1 million bail excessive where defendant was arrested for first-degree felony injury to a child).

Such is the case here. The $1 million bail is far beyond Hanson's ability to make. While a bail in half that amount might be reasonable, the current bail is excessive.

### III. Conclusion

There is insufficient evidence to support a finding that the $1 million bail is reasonably necessary to satisfy the government's interests and to assure Hanson's presence at trial. Although Hanson is charged with a serious, violent offense, he has not had any criminal arrests or convictions in more than 30 years; the record contains no evidence that he presents an identifiable danger to the community or one that cannot be mitigated with bail conditions; the risk of his flight is minimal in light of his age, disability, and ties to the community; the record contains no evidence that he has failed to appear in the past; and the $1 million bail is far more than he has the ability

to make. *See Briscoe*, 2015 WL 5893470, at *5 (holding $1 million bail excessive when "[a]lthough the circumstances and nature of the offense were severe, the remaining factors reveal[ed] that the bail was more excessive than necessary to ensure [the defendant's] appearance").

We are well aware of the serious nature of Hanson's murder charge, but we are also mindful of his constitutional rights. *See Cook*, 2019 WL 2323643, at *5. And one of those rights is the freedom from "[e]xcessive bail." U.S. Const. amend. VIII; *see* Tex. Const. art. I, § 13. We therefore reverse the trial court's order denying Hanson's requested bail reduction and remand the issue to that court to (1) set a reasonable bail; (2) determine what conditions, if any, should be imposed to ensure Hanson's presence at trial; and (3) allow the State and Hanson an opportunity to present additional evidence or argument. *Cook*, 2019 WL 2323643, at *5; *see* Tex. R. App. P. 31.3; *Peyton*, 2016 WL 2586698, at *6.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 12, 2022